# Asbury v. Mercy Fitzgerald Hospital

C.P. of Delaware County, no. 06-15525.

*Garland P. Cherry Jr.* and *Fincourt B. Shelton,* for plaintiffs.
*Brian E. Appel,* for defendants Planned Parenthood of Southeastern Pennsylvania, Lebed, and Wilson.

*George H. Knoell III,* for defendants Kanoff and Mercy Fitzgerald Hospital.

BURR, *J.,* April 14, 2010—The defendants, Joel P. Lebed D.O. and Planned Parenthood of Southeastern Pennsylvania, have appealed from this court's order denying their motion for post-trial relief The plaintiffs contended that the defendants had been medically negligent in removing subcutaneously implanted Norplant contraceptive rods from the left upper arm of the wife-plaintiff, Dana Asbury, in February of 2003. The plaintiffs claimed that the wife-plaintiff's median nerve had been injured through the defendants' negligence and that she had developed reflex sympathetic dystrophy (RSD), alternately, and more recently, known as complex regional pain syndrome (CRPS), throughout the left side of her body as a result.[1]

The defendants asserted at the hearing on their post-trial motion that the court erred in instructing the jury on the doctrine of res ipsa loquitur and that the jury's verdict in plaintiffs' favor was insufficiently supported in the evidence. (9/28/09 N.T. 2-3.) Nevertheless, the ensuing discussion will show that the court appropriately charged the jury on res ipsa loquitur because, while the exact

---

1. The plaintiffs filed the above-captioned consolidated claim against the defendants, Dr. Richard D. Kanoff D.O. and Mercy Fitzgerald Hospital, for damages arising from the performance of a purportedly unnecessary cervical laminectomy on November 3, 2004, which procedure was said to be the cause of CRPS/RSD spreading to and throughout the right side of the plaintiff's body. Following the jury's verdict of 40 percent negligence liability on the part of Dr. Kanoff for damages totaling $2,782,045, the plaintiffs' medical malpractice claim against him and Mercy Fitzgerald Hospital was settled and neither of these defendants is a party to the within appeal.

nature of the injury to the plaintiff's median nerve was uncertain, such an injury does not usually occur in the absence of negligence. Moreover, the evidence was sufficient for the jury to conclude that the defendants' negligence was more likely than not the cause of the claimed injury.

The facts from which this litigation arose are undisputed that, on February 20, 2003, the wife-plaintiff, Dana Asbury, underwent a minor surgical procedure on her left arm for the purpose of removing her second five-year set of six Norplant contraceptive rods at the office of the defendant, Planned Parenthood. The rods removal was initially undertaken by the defendant, Dr. Joel Lebed, an experienced gynecological surgeon and the new medical director of the defendant facility, but a relative novice who had performed the Norplant removal procedure only three other times previously in his entire career. (8/4/08 N.T. volume I 124-28.) Dr. Lebed made an incision at the situs of the rods and began a tugging effort to remove them while administering repeated injections of anesthetic to quell the plaintiff's complaints of significant pain during the unsuccessful procedure. Dr. Lebed then gave up and notified the defendant, Dr. Janet Wilson, that his attempts to remove the Norplant rods had been unavailing, after which Dr. Wilson completed their removal. Five days later, on February 25, 2003, the plaintiff presented to her primary care physician, Dr. Reginald Lee, with a complaint of left arm pain and thereafter, over the course of time, reported that the pain was moving to new sites such as her shoulder, neck, left leg and left foot. The pain syndrome progressed and worsened and by the time of the trial, most of wife-plaintiff's time

was consumed by seeking and receiving treatment for her RSD pain.[2]

Planned Parenthood's and Dr. Lebed's defense to this action consisted of contentions that there was no showing on an electro magnetic imaging (EMI) or an electromyogram (EMG) study of injury or damage to the plaintiff's median nerve and that plaintiff's RSD could not occur absent an injury thereto. (Trial memorandum of the defendants, Planned Parenthood, Dr. Lebed and Dr. Wilson, p. 2; post-trial motion hearing transcript 9/28/09 N.T. 21-27, 39-40; defendants' EMG expert's testimony, 8/5/08 N.T. volume 110-33 passim.) Further, according to the defense, the only actionable injury to the median nerve had to be a direct injury caused by a cut from a scalpel and not an indirect one caused by manipulation of the tissues surrounding the nerve as plaintiffs also contended was possible. (Post-trial motion hearing transcript 9/28/09 N.T. 13.)

The defendants asserted that there are two types of RSD: Type I, where RSD resulting from indirectly caused nerve damage can be initiated by any unpredictable and non-negligently caused bodily "trauma" such as a broken bone, severe sprain or even a surgical incision, and Type II, where the source is thought to be direct injury to a nerve from a scalpel or other instrumentality. (Trial memorandum of the defendants, Planned Parenthood, Dr. Lebed and Dr. Wilson, p. 2; 9/28/09 N.T. 13-14.) The

---

2. Wife-plaintiffs' testimony can be found in the trial transcript at 8/5/08 N.T, volume II 274-313 and 8/6/08 N.T. 3-147; Dr. Wilson's at 8/4/08 N.T. volume II 275-337 and 8/5/08 N.T. volume I 102-31; Dr. Lebed's at 8/4/08 N.T. volume I 122-70 and volume II 171-205; and Dr. Lee's at 7/31/08 N.T. volume II 212-358.

defendants contended that, because the court failed to find that RSD I was insufficiently eliminated by the evidence, that it erred in instructing the jury on the doctrine of res ipsa loquitur. (9/28/09 N.T. 14-15.) Moreover, in the defendants' opinion, any manipulation of tissues surrounding the plaintiff's median nerve could not have injured the nerve because there was no proof of surrounding scar tissue that would have rubbed against or impacted the median nerve at the operative site. (9/28/09 N.T. 19-21, 37.)

The defendants additionally suggested that possible other causes for plaintiff's pain could be "some RSD" of psychogenic origin, or an as yet undiagnosed nervous system ailment. (Trial memorandum of the defendants, Planned Parenthood, Dr. Lebed and Dr. Wilson, p. 2.) Defendants admitted, however, that, if such were established in the plaintiff's evidence, "there could be no direct injury to the median nerve unless the doctors had been negligent." (*Id.;* 8/8/08 N.T. 33.) In the defendants' view, without objective proof of a Type II direct, *i.e.,* scalpel inflicted, injury to the median nerve, the plaintiffs could not establish the defendants' breach of the standard of care for Norplant removal and did not deserve an instruction on the doctrine of res ipsa loquitur that would allow for the jury to draw an inference of their negligence from the facts and circumstances surrounding the operative procedure performed on the wife-plaintiff's left upper arm. (9/28/09 N.T. 37.)

A jury, on August 8, 2008, returned a verdict in favor of the plaintiffs and against the defendants, Drs. Richard B. Kanoff and Joel P. Lebed, having been instructed that a finding against any of the physician defendants would

also constitute a verdict against his or her employer. (8/8/08 N.T. 94-95.) The jury determined that the defendant, Janet Wilson M.D., had not negligently performed the Norplant removal procedure on the plaintiff on February 20, 2003, but that Dr. Lebed had been negligent in that regard and was thus 60 percent liable for a total damages award to the plaintiffs in the amount of $2,782,045, with $125,000 thereof being awarded to the plaintiff-husband, Ervin Asbury, for loss of consortium. It has already been noted that the plaintiffs' action against the defendants, Dr. Kanoff and his employer, Mercy Fitzgerald Hospital, deemed by the jury to be 40 percent liable for Mrs. Asbury's injury, has been settled.

Following the denial of their timely filed motion for post-trial relief,[3] Dr. Lebed and Planned Parenthood submitted the following concise statement of matters complained of on appeal that recapitulates, very nearly verbatim, the matters raised in their motion for post-trial relief:

3. This court's order denying the defendants' motion for post-trial relief also granted, no response thereto having been timely filed by the defendants, the plaintiffs' motion to mold verdict and to enter final judgment thereon including counsel fees and costs on the award for future medical expenses (pursuant to the MCARE Act, 40 P.S. §1303.509(b)(l)), delay damages (pursuant to Pa. R.C.P. 238), and post-verdict interest. Judgment was thereby entered in favor of the plaintiff, Dana Asbury, and against the defendants, Planned Parenthood and Joel Lebed D.O., in the amount of $1,296,748,21 plus post verdict interest of $213.16 per day from the date of the verdict (August 8, 2008). Judgment was thereby also entered in favor of the plaintiff-husband, Ervin Asbury, and against the defendants, Planned Parenthood and Joel Lebed D.O., in the amount of $75,000 plus post-verdict interest of $12.33 per day from the date of the verdict. (Order of September 29, 2009 denying the defendants' motion for post-trial relief and granting the plaintiffs' motion to mold verdict and to enter final judgment thereon, pp. 1-2.)

"*I. Motion For Judgment n.o.v.:*

"Given the evidence and inferences favorable to the plaintiffs, there was a failure of proof by a preponderance of the evidence, or, stated in the alternative, the weight of the evidence favored the [d]efendants, in that:

"(1) There was no specific standard of care asserted by expert testimony to be applicable to Dr. Lebed's manner of use of the surgical instruments for the Norplant removal process.

"(2) There was insufficient evidence (*i.e.* not a preponderance) of a particular act or omission by Dr. Lebed that constituted a breach of the aforesaid nonspecified standard[.]

"(3) There was no (or insufficient) evidence from which a jury could have found that a specific breach of a particular standard of care was, to a reasonable degree of medical certainty, the factual cause of the pain syndrome reported by Mrs. Asbury, whether it was RSD [reflex sympathetic dystrophy] or some other undiagnosed phenomenon.

"(4) If it was error to submit the res ipsa loquitur instruction to the jury, then as a matter of law, plaintiffs did not meet their burden of proof of the elements of medical malpractice.

"*II. Motion For A New Trial*[:]

"Defendants seek a new trial in light of the prejudicial impact, individually and cumulatively, of the following erroneous rulings:

"(1) The court refused to adopt the proposed special jury interrogatory, which should have required the jury

to decide expressly if the left median nerve had been injured, since the [p]laintiff had asserted [a] specific factual assertion [sic] as central to the jury's determination—that the Type II RSD condition was triggered by a specific act in breach of the standard of care which proximately caused damage to the left median nerve.

"(2) The court erroneously refused, at the end of the presentation of all the evidence, to rule as a matter of law that the doctrine of res ipsa loquitur was not applicable to the facts of this case, where [p]laintiffs' evidence had not met the specific mandatory foundation for the application of the doctrine—the elimination of 'other responsible causes.'

"(3) The court erroneously ruled as a matter of law, at the presentation of all the evidence, that the doctrine of res ipsa loquitur could apply to this case, if the jury saw fit to do so, where [p]laintiffs' evidence had not met the specific mandatory foundation (regarding elimination of other responsible causes) for the submission of that instruction to the jury, and the court over objection gave res ipsa loquitur instructions.

"(4) The court erroneously instructed the jury that the doctrine of res ipsa loquitur could apply in their deliberations, where [p]laintiff[s'] counsel, during closing argument, declared that [p]laintiffs' theory of liability had nothing to do with a *direct injury to the median nerve,* but instead that *the elements of negligence had been proved,* by reason of some sort of 'excessive tissue manipulation.'

"(5) The court erroneously allowed [p]laintiffs' experts to refer to 'excessive tissue manipulation' as establishing or suggesting a standard of care. The evidence clearly

established that the concept could not have applicability as a 'standard of care['] capable of being met in an objective manner by a physician engaged in the removal of Norplant rods. Moreover, having permitted the [p]laintiffs to offer this evidence about standard of care, the court erroneously permitted the jurors to confuse the assessment of proximate cause (from that particular breach) by inviting them to consider the doctrine of res ipsa loquitur[.] That doctrine has *only* to do with a legally-proper inference of *negligence;* it has nothing to do with consideration of the separate question of proximate cause.

"(6) The court erroneously (over objection) instructed the jury on the doctrine of res ipsa loquitur where [p]laintiffs undertook to prove both proximate cause and negligence by the evidence of onset of reflex sympathetic dystrophy (RSD) or some other pain syndrome.

"(7) The court erroneously permitted plaintiffs' expert[,] Dr. Papperman, to give testimony on opinions beyond the fair boundaries of his written report, to the clear prejudice of the defendants.

"(8) The court erroneously permitted plaintiffs' expert[,] Dr. Papperman, to give opinion testimony on matters strictly within the medical specialty of neurology, even though Dr. Papperman admitted that he was definitely not a neurologist and had never practiced neurology; and where Dr. Papperman gave no basis for a legitimate finding of a pretense to knowledge (based on his post-medical school training and experience) on the neurology opinion issues involved. His opinion testimony could not, as a matter of law, provide a reliable foundation of proof of causation and damages.

"(9) The court erroneously permitted plaintiffs' expert[,] Dr. Papperman, to give testimony that was pure speculation without factual basis, and, indeed, which was flatly contradicted by the uncontested available medical facts.

"(10) The court erroneously refused the request of defendants to permit the jury to take into the jury room (during deliberations) the surgical instruments, simulated practice 'arm', and Norplant rods, where both [d]efendants' and [p]laintiffs' counsel offered testimony about them, and where the use of the instruments was central to the jury's deliberations on negligence and proximate cause.

"(11) The jury finding that Dr. Lebed was negligent was logically and factually inconsistent with the jury finding that Dr. Janet Wilson was not negligent, and therefore, the verdict as to Dr. Lebed is flawed as a matter of law[.]

"(12) The jury finding of negligence on the part of Dr. Lebed was against the weight of the evidence . . . where there was no testimony actually in conflict with Dr. Lebed's testimony in substance that his conduct was in accord with the recommendations of the manufacturer of the Norplant [r]ods (which[,] in any event[,] did not establish a 'standard of care' as contended by the plaintiffs) regarding the technique to be used to remove Norplant rods.

"*III. Motion To Mold Or Modify Verdict Re[:] Loss Of Earning Capacity[:]*

"(1) Section 510 of the [MCARE] Act states: '[f]uture damages for loss of earnings or earning capacity in

medical professional liability action shall be reduced to present value.' Plaintiff[s'] expert[,] Mr. Verzilli[,] demonstrated in his testimony that he was aware [o]f the requirement of reduction to present value. Nonetheless, the calculation he presented to the jury ($1,094,805) was not reduced to present value." (Defendants' concise statement of matters complained of on appeal, pp. 1-5.) (emphasis supplied) Dr. Lebed's and Planned Parenthood's (defendants) appellate issues are discussed under the appropriate headings below.

## I. MOTION FOR JUDGMENT N.O.V.

### A. *Res Ipsa Loquitur Instruction*

#### 1. Introduction

Succinctly put, nearly the entirety of the issues raised by the defendants in this appeal can be summarized in the first heading to their brief in support of their motion for post-trial relief, to wit: "Where the requirements for a res ipsa loquitur charge were not met, it was reversible error for the trial court to give the charge." (Concise statement, motion for judgment n.o.v., paragraphs 1 through 4; and motion for a new trial, paragraphs 1 through 6; defendants' brief in support of motion for post-trial relief, p. 1.) The defendants have explained that they do not object to the language of the court's instruction to the jury on the doctrine of res ipsa loquitur, but that it is their belief that the giving of the instruction to the jury was reversible error because "[t]his particular res ipsa charge supplied missing elements of proof of both negligence and causation." (Defendants' brief in support of motion for post-trial relief, p. 2.) Thus, it

would appear that the language of the court's res ipsa loquitur charge is, indeed, bothersome to the defendants, although the issue had long been waived.

Below appear the content of the court's closing instructions on the standard of care to be exercised by physicians in general, followed by the res ipsa loquitur instruction at issue in this appeal as applicable only to Drs. Lebed and Wilson, concluding with the court's final instruction on causation. It is here noted that the court, at the jury's request, reinstructed on the issue of res ipsa loquitur, again advising that this charge pertained only to the conduct of Drs. Wilson and Lebed, and on the issue of causation, both reinstructions having been issued without objection from the defendants before the jury returned with its verdict. (8/8/08 N.T. 167-71; 171-73.)

*Closing instructions on negligence and the applicable standard of care*

"So negligence in the law is simply defined as the absence of ordinary care such as a reasonably prudent person would exercise under the circumstances of this case. In other words, negligence is the doing of something that a reasonably prudent person would not do under the circumstances of this case. Or negligence can be the not doing of something that a reasonably prudent person would do under the circumstances of this case. And we're speaking in this case of negligence that involves physicians. So the negligent or careless or unskilled performance by a physician of the duties performed by him or her by the professional relationship with his or her patient arising out of that patient/doctor relationship, that's the determination. So you're simply looking to determine

whether or not the responsibility that arises from the doctor/patient relationship was met by the defendant physicians.

"A physician is negligent when he shows a lack of proper care or skill in the performance of a professional act. That's what professional negligence is. And I haven't changed the definition of negligence at all, and I'm not going to do so. Now in this matter and in such cases, ladies and gentlemen, the plaintiff's claims here do not involve punishment of any of the defendants or any criticism of his or her professional abilities beyond the specific facts of this case. It is simply to make a determination as to the specific incidents that have been alleged here by the plaintiff whether or not as to that specific relationship the defendant had with the patient, whether that relationship—whether the doctor acted negligently. So that's what this case is about. So those other considerations I just mentioned to you are irrelevant. In other words, they're not going to help you along this path to a fair, just and impartial decision in this case.

"Now the mere fact that some harm arises out of a physician/patient relationship or there are bad results, none of those things, standing alone, equate to negligence. A physician is neither a warrantor of a cure nor a guarantor of a result of his or her treatment. Even if there was to be a misdiagnosis, that does not necessarily equate to negligence. The law does not require prophetic insight, perfection or infallible judgment of any physician. It only requires that he or she possess a reasonable average ability to carry out his or her professional work and that he or she exercised reasonable care, skill and judgment in

so doing. In a case of this nature, as I said to you before, the initial determination must be based upon expert testimony where an expert is testifying to a reasonable degree of medical certainty. What was the standard of care that applied to this physician/patient relationship? What was the standard of care? And secondly, did the defendants adhere to that standard of care or did they breach it or break it or not adhere to it? So that you must be satisfied, as I said, from expert testimony to a reasonable degree of medical certainty what the standard of care was that governed the physician's conduct at the time of the physician/patient relationship. And then you must be satisfied before the plaintiffs can be successful that the defendant failed to adhere to or abide by or comply with that standard of care." (8/8/08 N.T. 117-21.)

*Closing instruction on res ipsa loquitur*

"Now with respect only to Drs. Wilson and Lebed, the plaintiff must establish their negligence by the greater weight of the evidence. And the plaintiff—they do this by circumstantial evidence. That is, by proving facts and circumstances from which negligence may reasonably be inferred. You may infer that the claim[ed] injuries that plaintiff alleges were caused either by Dr. Wilson or Dr. Lebed, either or, or both, if you find the following three factors to have been present. First, that the claim[ed] injuries involved here are the kind that ordinarily do not occur in the absence of negligence. In this connection, you must consider the general knowledge of the community, the evidence of the parties or expert testimony. Second, that other reasonable causes, including the con-

duct of plaintiff and third persons, have been sufficiently eliminated by the evidence. But it is not necessary that the plaintiff exclude all other possible causes of her claimed injuries, evidence that it is more likely than not that the plaintiff's claimed injuries were caused by the defendant's negligence is sufficient to permit the inference. In this connection, if you find that the defendants had exclusive control of the instrumentalities that were involved here at the time when the negligence that is claimed would have occurred, you may determine that such other causes have been sufficiently eliminated. And third, that the negligence claimed is within the scope of the defendant's duty to the plaintiff.

"Now although the defendants are not required to offer an explanation for the occurrence of the claimed injuries in this case, if they do so, it is for you to weigh that explanation in relation to all the evidence, to determine whether negligence by either one of these defendants, or both, may be reasonably inferred. Again, in the situation like this where you have the conduct of two or more persons which is claimed to be negligent, and it is proved that the claimed injuries were caused by the negligent conduct of only one of them, but there is uncertainty as to which one caused it, it is the burden upon each of these physicians, that is, Dr. Wilson and Dr. Lebed, to prove that he or she has not caused the claimed injuries. Now, if you find that some or all of the defendants were negligent, you['ve] got to go to the next issue now. And that is the causation. And the fact that you found—may have found the doctor's [sic] negligent doesn't necessarily mean the plaintiffs automatically recover any money, dollars and cents. It means you must go on to that next question and decide whether or not

there was a factual cause connected to that negligence. In other words, did the negligence legally cause the claimed harm to the plaintiff? . . . ." (8/8/08 N.T. 122-24.)

## Closing instruction on causation

"Factual cause, as I mentioned to you before, is that bridge that exists and must be crossed before the plaintiff can recover any money. It is a factual cause that connects the negligence that the jury finds to have caused some harm to the plaintiff. And without that bridge, the plaintiffs cannot recover. What is factual cause? Negligent conduct is a factual cause of harm if the conduct played an actual real role in harming the plaintiff, Mrs. Asbury. The connection between the conduct and the harm cannot be imaginary or insignificant. And there may be more than one factual cause of harm. You can find conduct a factual cause of harm even if a person's contribution to the harm was relative[ly] minor or the result unusual. A person remains responsible for his or her conduct that causes harm, even if other causes contributed to the harm . . . .

"Now there may be, of course, more than one factual cause in bringing about harm to somebody. But it doesn't have to be the sole cause, but does have to be a cause. So in different words, one of the question among the many you're going to want to answer in your own minds, is determ[ining] whether or not the harm alleged in this matter would have been sustained if any of the defendants had not been negligent. In that event, the negligent conduct of the defendant's would not be a factual cause in bringing about harm. Do you understand? To state it

another way, the negligent conduct of the defendants, defendant, or a defendant is a factual cause in causing harm to the plaintiff if that harm would not have been sustained had the defendant not acted negligently." (8/8/08 N.T. 124-27.)

When the court convened counsel for all of the parties for a side-bar conference to hear their "exceptions, corrections, deletions, modifications or other comments regarding the court's instruction to the jury", counsel for Dr. Lebed and Planned Parenthood raised three of these. (8/8/08 N.T. 140, 156-58.) The first two concerned remarks made by plaintiff's counsel in his closing argument to the jury[4] that the defense interpreted as abrogating a claim of direct injury to the median nerve and the third was presented as follows:

"The third point is, and on this I renew my motion for directed verdict at this time as to both defendants, for my clients. [plaintiff's counsel] now takes the position that nobody says this was a direct injury to the median nerve, this statement exactly. Therefore, your honor, there is no basis on which the court can charge on res ipsa loquitur since a direct injury to the nerve . . . is a [sine qua non] . . . of res ipsa. There is now, without question, an alternative reason, which is perfectly reasonable and well established in the testimony for RSD. Furthermore, it makes extreme sense since there could not have been scar tissue present, and I ask the court to take judicial

---

4. Defense counsel alleged that plaintiffs had abandoned their theory of a direct hit on the median nerve by virtue of plaintiffs' counsel's closing remark to the jury: "But nobody has suggested there's a direct hit on the median nerve." (8/8/08 N.T. 52.) Nevertheless, this sentence was followed immediately by plaintiffs' counsel's statement that: "I'm not excluding that possibility." *(Id.)*

notice of that, could not have been scar tissue present at the time of the removal process. So, I ask for those two remedies, your honor." (8/8/08 N.T. 158-59.)

The court denied the defendants' renewed motion for directed verdict and request for judicial notice of counsel's representation that there could have been no scar tissue present in the plaintiff's arm and thus, presumably, no opportunity for scar tissue to later develop so as to cause an injury to her median nerve. (8/8/08 N.T. 159.)[5] There is no indication in the trial record that the defendants objected or took exception to any aspect of the court's res ipsa loquitur or any other instruction on negligence or causation at this time, nor requested that they be stricken, modified or corrected in any way before the jury retired to deliberate and returned with its verdict.

It is here noted that defendants' pre-charge objections or exceptions to the court's closing instruction on res ipsa loquitur were not transcribed for the record, including the one raised as grounds for a new trial in this appeal. The defendants now take issue with the court's denial of their request for a special jury interrogatory "which should have required the jury to decide expressly if the left median nerve had been injured, since the [p]laintiff had asserted [a] specific factual assertion [sic] as central to the jury's determination—that the Type II RSD condi-

---

5. Any such claim on defendants' part was refuted by testimony from plaintiffs' Norplant removal expert, Dr. Thomas W. Papperman, that an early MRI scan of plaintiff's left upper arm was likely taken too soon for scar tissue to be visible on the study. (8/5/08 N.T. volume II 228-35.) However, Dr. Papperman gave testimony that a second MRI scan taken of the plaintiff's left upper arm on October 17, 2005 did evince the formation of scar tissue that could have impacted and damaged her median nerve. (8/5/08 N.T. volume II 268-69.)

tion was triggered by a specific act in breach of the standard of care which proximately caused damage to the left median nerve." (Concise statement, motion for new trial, paragraph 1.)

It is procedurally axiomatic in the courts of this Commonwealth that any issues on appeal surrounding the wording of a verdict slip or the language or content of a court's closing instruction to the jury must be deemed waived and foreclosed by the defendants' approval of the verdict slip submitted to the jury and failure to make a record objection to either before the issuance of the jury's verdict. Pennsylvania Rule of Appellate Procedure 302(b) (requiring specific objection to be made in the trial record of "the language or omission complained of"); Pennsylvania Rule of Civil Procedure 227(b) ("[u]nless specifically allowed by the court, all exceptions to the charge to the jury must be taken before the jury retires . . . .") and explanatory comment 1983; *Tindall v. Friedman,* 970 A.2d 1159 (Pa. Super. 2009); and *Dilliplaine v. Lehigh Valley Trust Company,* 457 Pa. 255, 322 A.2d 113 (1974) (a ground for new trial or judgment n.o.v. must be raised timely in pretrial proceedings or during the trial, thus affording the court the opportunity to correct the error). Therefore, the only concern regarding what the jury was asked to do at this trial is whether the plaintiffs' circumstantial evidence of the defendants' negligence warranted a res ipsa loquitur instruction under the applicable law. (Concise statement, motion for judgment n.o.v., paragraph (d).)

## 2. The Applicable Law

Because there are numerous misapprehensions and misstatements of the law pertaining to the doctrine of res

ipsa loquitur in the defendants' post-verdict briefing and legal argument, it is appropriate to clarify Pennsylvania precedent as it developed through the years as it pertains to the issues in this litigation.

It is a well-established general rule in Pennsylvania that a medical malpractice claimant must establish, through competent expert testimony, that a defendant physician breached the applicable standard of care and that the breach caused injury to the plaintiff. *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978). The narrow exception to this general rule is founded in the state Supreme Court's adoption, in *Gilbert v. Korvette's Inc.,* 457 Pa. 602, 327 A.2d 94 (1974), of section 328D of the Restatement (Second) of Torts, which sets forth the doctrine of res ipsa loquitur as follows:

"(1) It may be inferred that harm suffered by the plaintiff is caused by negligence of the defendant when

"(a) the event is of a kind which ordinarily does not occur in the absence of negligence;

"(b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and

"(c) the indicated negligence is within the scope of the defendant's duty to the plaintiff." (Restatement (Second) of Torts, §328D.)

Comment e on clause (a) of subsection (1) of section 328D elaborates on a plaintiff's burden to show the foregoing elements, providing, in relevant part:

"The plaintiff's burden of proof . . . requires him to produce evidence which will permit the conclusion that

it is more likely than not that his injuries were caused by the defendant's negligence. Where the probabilities are at best evenly divided between negligence and its absence, it becomes the duty of the court to direct the jury that there is no sufficient proof. The plaintiff need not, however, conclusively exclude all other possible explanations, and so prove his case beyond a reasonable doubt .... It is enough that the facts proved reasonably permit the conclusion that negligence is the more probable explanation. This conclusion is not for the court to draw, nor to refuse to draw, in any case where either conclusion is reasonable; and even though the court would not itself find negligence, it must still leave the question to the jury if reasonable men might do so." Restatement (Second) of Torts, section 328D, comment e on clause (a) of subsection (1), as set forth in *Sedlitsky v. Pareso,* 400 Pa. Super. 1, 5, 582 A.2d 1314, 1315-16 (1990).

Section 328D thus provides that it is the court's function to determine whether these inferences may reasonably be drawn, and that res ipsa loquitur is neither a rule of procedure nor of substantive tort law, but rather a shorthand expression for circumstantial proof of negligence that allows the jury to infer causation from the circumstances surrounding the claimed injury, which, in this instance, was damage to the median nerve in the plaintiff's upper left arm. *Quinby v. Plumsteadville Family Practice Inc.,* 589 Pa. 183, 907 A.2d 1061 (2006).

The doctrine was first applied in a medical malpractice action in *Jones v. Harrisburg Polyclinic Hospital,* 496 Pa. 465, 437 A.2d 1134 (1981), wherein the Pennsylvania Supreme Court set forth the following rationale for its finding that expert testimony was required to prove

that suprascapular nerve palsy following gynecological surgery does not ordinarily develop in the absence of negligence:

"(d) Basis of conclusion. In the usual case the basis of past experience from which this conclusion may be drawn is common to the community, and is a matter of general knowledge, which the court recognizes on much the same basis as when it takes judicial notice of facts which everyone knows. It may, however, be supplied by the evidence of the parties; and expert testimony that such an event usually does not occur without negligence may be essential to the plaintiff's case where, as for example in some actions for medical malpractice, there is no fund of common knowledge which may permit laymen reasonably to draw the conclusion. On the other hand, there are other kinds of medical malpractice, as where a sponge is left in the [patient's] abdomen after an operation, where no expert is needed to tell the jury that such events do not usually occur in the absence of negligence." *Id.* at 473 n.11, 437 A.2d at 1138 n.11.

In other words, unless the alleged malpractice at issue is "so simple, and the lack of skill or want of care so obvious, as to be within the range of ordinary experience and comprehension of even non-professional persons," expert testimony is required in a res ipsa loquitur case in order to establish that the result does not ordinarily occur in the absence of negligence. *Brannan v. Lankenau Hospital,* 490 Pa. 588, 598, 417 A.2d 196, 201 (1980).

*Sedlitsky v. Pareso, supra,* involved a claim against a general surgeon for causing paralysis of the plaintiff's vocal cord during a procedure to remove half of her

thyroid gland. The lower court's decision not to instruct on res ipsa loquitur because the defendant surgeon had produced expert opinion testimony that this result can occasionally occur from this type of surgery was reversed by the Pennsylvania Superior Court. *Id.* at 4, 582 A.2d at 1316. The Superior Court held that the plaintiff's expert's testimony that the defendant breached the requisite standard of care by failing to prevent damage to her vocal cord and that her injury could not have occurred in the absence of negligence unless unusual circumstances were present was sufficient to establish the first prong of section 328D. *Id.* at 6, 582 A.2d at 1316. The *Sedlitsky* court further found that the defendant's failure to rebut the plaintiff's evidence that he had negligently stretched the plaintiff's vocal cord while he controlled the environment in which her surgery took place completed the three-pronged test for warranting an instruction on res ipsa loquitur, despite the abovesaid contrary evidence having been produced by the defense. *Id.*

The Superior Court, in a subsequent case in which a plaintiff was unconscious and thus unable to aver the specific conduct that caused injury to her peroneal nerve during arthroscopic knee surgery, held that a jury is allowed reasonably to infer that the occurrence of such an unusual event during a procedure performed under the guidance and exclusive control of the defendant established both negligence and causation. *Leone v. Thomas,* 428 Pa. Super. 217, 222, 630 A.2d 900, 902 (1993). In that action, the court also held that a patient's failure to show that other causes of her injury were impossible did not prevent her from sustaining her burden of proving the element of section 328D (1) that requires other re-

sponsible causes to be sufficiently eliminated by the evidence. *Id.* at 222, 630 A.2d at 902. It was sufficient for the plaintiff to show that the alleged negligence on the part of the responsible surgeon was more likely than not the probable explanation for the injury. *Id.*

In a 1997 decision in an action similar to *Sedlitsky v. Pareso, supra,* also alleging medical negligence as the cause of paralysis of the plaintiff's vocal cord during a thyroidectomy, the Pennsylvania Supreme court reaffirmed that precedent in holding that: (1) expert testimony ruling out all other causes of injury to the plaintiff's laryngeal nerve, and (2) deeming it the kind of event that did not occur in the absence of negligence during an operative procedure under the defendant's exclusive control, and (3) within the purview of the defendant's duty to the plaintiff, warranted a res ipsa loquitur instruction. *Hightower-Warren v. Silk,* 548 Pa. 459, 698 A.2d 52 (1997). In *Hightower-Warren v. Silk, supra,* the defendant had claimed strangulation of the laryngeal nerve by scar tissue subsequent to the surgery as a possible other cause for the vocal cord paralysis, but had made no mention of such possible scar entrapment in his discharge summary that he had not prepared for seven months after his performance of the procedure in question. *Id.* at 466-67, 698 A.2d at 55-56.

The case authority of *Toogood v. Rogal,* 573 Pa. 245, 824 A.2d 1140 (2003), disallowed a res ipsa loquitur instruction in the absence of the expert medical testimony that the plaintiff was precluded from proffering as a discovery sanction. There, the Pennsylvania Supreme Court concluded that without expert testimony to establish the applicable standard of care, it was not within the

fund of the common knowledge of the jury to infer that paravertebral nerve block injections for back pain should not have caused the collapse of the plaintiff's lung. *Id.* at 262-63, 824 A.2d at 1150. In *Quinby v. Plumsteadville Family Practice Inc., supra,* the Pennsylvania Supreme Court, noting that *Toogood, supra,* was a plurality opinion lacking precedential value, disapproved of the defendants' use of that case authority to argue that they had no exclusive control of the instrumentality causing the claimed harm when the plaintiff's decedent, a quadraplegic, fell from an examining table while unattended in a room following surgery to remove a lesion from his head and where no direct evidence of negligence had been presented. *Id.* at 197-98 n.14, 907 A.2d at 1070 n.14. The *Quinby* court distinguished *Toogood* as follows:

"In any event, *Toogood* concerned whether the doctrine of res ipsa loquitur could relieve a plaintiff of the burden of producing expert testimony to demonstrate negligence in a case that was medically complex, involving the injection of a paravertibral nerve block that resulted in a pneumothorax. *Toogood,* 824 A.2d at 1150. Because this procedure involved 'professional treatment at a professional level,' *id.,* involving 'complex issues of anatomy, medical science, invasive procedures, and precision performance,' the lead opinion held that it was essential to the plaintiff's case to introduce expert testimony. *Id.* Therefore, the *Toogood* plurality held that in a medically complex case, the determination of whether, absent negligence, the injection of a paravertebral nerve block could result in a pneumothorax, was beyond lay knowledge, and, accordingly, plaintiff could not dispense with the requirement of producing expert testimony on the elements of negligence by relying on res ipsa loquitur.

"Here, in contrast, it cannot be said that such legitimate concerns attach because the procedure of removing a lesion is unrelated to the asserted negligence, which involves the defendants' positioning and securing of decedent, a quadriplegic, on an examination table, a non-complex medical scenario. Moreover, Quinby did present expert testimony, and [did carry] her burden in this regard." *Quinby v. Plumsteadville Family Practice Inc., supra* at 203, 907 A.2d at 1073.

The *Quinby* court thus concluded that, whether or not the plaintiff had presented expert testimony to establish the negligence of the defendants, an instruction on res ipsa loquitur should have been given by the lower court because the evidence so strongly supported the inference of the defendants' negligence that plaintiffs' executrix was entitled to judgment on her negligence claim.

Finally, in *MacNutt v. Temple University Hospital Inc.,* 932 A.2d 980 (Pa. Super. 2007), the Pennsylvania Superior Court declined to order a res ipsa loquitur instruction in a case alleging the sustaining of a chemical burn on the plaintiff's shoulder while he was undergoing an operative procedure to correct thoracic outlet syndrome so as to create an inference of the surgeon's negligence. The parties' experts had intensely disputed the exact nature of plaintiff's injury with the plaintiff's expert opining that the patient's purported burn came from lying in a pool of betadine antiseptic solution, and the defense expert proffering the notion that the plaintiff had suffered from an outbreak of herpes zoster, or shingles. Because the nature of the claimed injury was so much in dispute, the injury could have resulted in the absence of negligence and the first element set forth in section 328D(1)(a) could not have been met. *Id.,* 932 A.2d at 989-91.

In this case, it is not the nature of the injury that is in dispute, but whether or not, and how, it came to be sustained. The plaintiffs contended that Mrs. Asbury's median nerve had been damaged either indirectly, to cause Type I RSD, or directly, to cause Type II RSD. The defendants contended that there was no such damage and that plaintiff's RSD was psychogenic in origin or caused by some as yet undiagnosed disease. In the alternative, defendants maintained that, if the plaintiff's median nerve had been damaged in the Norplant removal procedure, plaintiffs were required to show a direct Type II RSD injury, alleging that plaintiffs' evidence that the damage to the median nerve at the situs of the Norplant removal procedure could have been indirectly incurred was fatal to their case because a Type I injury could be sustained in the absence of negligence.

The first inquiry sub judice in determining whether the plaintiffs' evidence of negligence warranted a res ipsa loquitur instruction is whether the circumstances surrounding the plaintiff's injury were so outside of the realm of the jury's common fund of knowledge as to require expert testimony to establish negligence, and the answer is an undisputed yes. *Jones v. Harrisburg Polyclinic Hospital, supra.* The second is whether or not the plaintiffs met their burden of satisfying the three-pronged test necessary for warranting such an instruction that would allow for the jury to infer the defendants' negligence and causation from the circumstances surrounding the claimed injury of damage to Mrs. Asbury's median nerve: "(a) the event is of a kind which ordinarily does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and

third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff." Restatement (Second) of Torts, §328D(1).

The plaintiffs presented testimony from Dr. Thomas W. Papperman, their Norplant removal expert, that Dr. Lebed breached the requisite standard of care in performing the Norplant removal procedure and that performing that procedure ordinarily does not result in an injury to the median nerve of the patient. (8/5/08 N.T. volume 216.) Indeed, plaintiffs' proffered expert testimony was, as the defendants readily admitted through the testimony of their own Norplant removal expert, Dr. Steven Sondheimer, that development of RSD following removal of Norplant contraceptive rods was extremely rare and that the plaintiff's RSD was the only such occurrence in the Norplant removal lexicon from a population of over 100,000 American women who underwent the procedure. (Defendants' brief in support of post-trial motion, p. 6; 8/4/08 N.T. volume I 39-42.) Hence, by proffering expert testimony that Dr. Lebed's attempt to remove the rods fell below the standard of care and that RSD had never resulted from performance of that procedure, the plaintiffs met their burden of satisfying the requirement of showing that the injury to plaintiff's median nerve in these circumstances does not ordinarily occur in the absence of negligence. Restatement (Second) of Torts, §381D(l)(a); *Jones v. Harrisburg Polyclinic Hospital, supra; Brannan v. Lankenau Hospital, supra.*

Further, even though the record is replete with evidence that plaintiff suffers from RSD resulting from an injury to her median nerve at the situs where the proce-

dure was performed, the defendants have continually argued that it was necessary for plaintiff to specifically prove a direct (Type II) injury to the nerve and that plaintiff could not show an indirect (Type I) injury to that structure, nor disprove that her RSD did not originate from an unknown or undiagnosed cause. (*Id.,* 7-8.) Here again, by showing that the foregoing nerve damage could not have been incurred in the absence of negligence, the first element warranting a res ipsa loquitur instruction that would allow the jury to determine whether the damage to the median nerve in the plaintiff's left upper arm was directly or indirectly inflicted by the defendants was met. *MacNutt v. Temple University Hospital, supra.*

However, despite their present contention that a res ipsa loquitur instruction should not have been given absent proof of a Type II direct injury to the median nerve in plaintiff's left upper arm, defendants have also been content to acknowledge that plaintiff does suffer from a sort of RSD that could have been non-negligently caused by an indirect Type I injury to her median nerve during the procedure as well. (9/28/09 N.T. 13-28 passim.) Because they ignored the rarity of RSD resulting from a Norplant removal procedure, this position of the defendants rested on the erroneous belief that the tendency of such unpredictable trauma to be non-negligently inflicted meant that Dr. Lebed had not breached the standard of care in injuring plaintiff's median nerve. (*Id.*) Nevertheless, Dr. Papperman's testimony that the damage to plaintiff's median nerve could not have been sustained in the absence of negligence worked to justify an instruction on res ipsa loquitur. The defendants have apparently adopted a fallback position on appeal that plaintiffs

were required to prove a direct Type II hit to the median nerve based on a self-serving conclusion that, because plaintiffs presented no objective test result or study evincing a direct hit to the median nerve, they had not proved their ease of negligence at all. This, despite sufficient evidence of record that a Type II direct injury to the median nerve might not appear on an EMG study and, indeed, that it need not appear on such a study in order for RSD to be diagnosed.

Overall, the defendants' contentions show a complete misunderstanding of the analysis necessary in deciding whether plaintiffs had met the section 328D(1)(a) requirement necessary to warrant an instruction on res ipsa loquitur that would allow the jury to resolve whether plaintiff's RSD was caused by either a Type I or Type II injury to her median nerve from the circumstances of the defendants' conduct of the Norplant removal procedure. Defense counsel exhibited a similar misapprehension of the applicable law during the hearing on defendants' post-trial motion when contending that the "doctrine of exclusive control" necessary under section 328D(1)(b) was inapplicable because Dr. Lebed did not have control of the plaintiff's "complete neurological system" while he was attempting to remove the Norplant rods. (9/28/09 N.T. 12.) However, defense counsel accepted, without objection, guidance from the court defining the concept as "controlling the operative site" of the performance of the procedure itself. (*Id.*, 12-13.) Simply put, a showing under section 328D(1)(b) that all other causes of plaintiff's injury were sufficiently eliminated from the evidence were fulfilled by Dr. Papperman's expert opinion, expressed within a reasonable degree of medical cer-

tainty, that Dr. Lebed's attempted removal of the Norplant rods had been negligent; that damage to the median nerve in plaintiff's upper left arm could not have occurred in the absence of negligence; and that plaintiff's median nerve injury had been sustained while she was alone in the treatment room with the defendant who had "exclusive control" of the operative site. *Hightower-Warren v. Silk, supra; Leone v. Thomas, supra.*

Nevertheless, the defendants have persisted in proffering the legally misguided opinion that, in order to receive an instruction on res ipsa loquitur, the plaintiffs had to be locked into proving a Type II direct injury to the plaintiff's median nerve that could not be shown by means of an EMG, when the law allowed the plaintiffs to proffer evidence that Mrs. Asbury had suffered an injury to her median nerve, whether directly or indirectly inflicted by the defendant, Dr. Lebed, when he was performing the procedure and that the injury might not appear on an EMG. (*Id.,* 2-4.) Finally, any purported failure by the plaintiffs to show that other causes of Mrs. Asbury's injury were impossible did not prevent them from carrying their burden of proving the element of section 328D(1)(b) necessitating that other responsible causes for her injury be eliminated by the evidence. *Leone v. Thomas,* 428 Pa. Super. at 221-22, 630 A.2d at 902. It was sufficient under the law for the plaintiffs to show that the alleged negligence by Dr. Lebed was more likely than not the probable explanation for her injury in order to warrant a res ipsa loquitur instruction to the jury. *Id.* The doctrine of res ipsa loquitur then allowed for the uncertainty in the circumstances as to how and at whose hand the plaintiff's alleged nerve damage was sustained

to be appropriately resolved by the jury. *Quinby v. Plumsteadville Family Practice Inc., supra; Sedlitsky v. Pareso, supra; Leone v. Thomas, supra.*

As for whether the plaintiffs established prong three of the res ipsa loquitur test set forth in section 328(D)(1)(c), the defendants do not dispute that the alleged negligence was within the scope of their duty to the plaintiff. (Defendants' brief in support of post-trial motion 11-12.) Hence, and for all of the foregoing reasons, the plaintiffs met the requirements of section 328D(1)(a), (b) and (c) of the Restatement (Second) of Torts so as to warrant a res ipsa loquitur instruction for the jury.

The inquiry next turns to whether defendants were improperly denied judgment n.o.v. on grounds that plaintiffs did not meet their burden of establishing a circumstantial case of medical negligence sufficient to warrant a jury charge on the doctrine of res ipsa loquitur.

### B. *Plaintiffs' Alleged Failure To Prove Medical Negligence*

The defendants assert in this appeal that they are deserving of judgment n.o.v. because: "[g]iven the evidence and inferences favorable to the plaintiffs, there was a failure of proof by a preponderance of the evidence, or, stated in the alternative, the weight of the evidence favored the [d]efendants, in that: (1) [t]here was no specific standard of care asserted by expert testimony to be applicable to Dr. Lebed's manner of use of the surgical instruments for the Norplant removal process; (2) [t]here was insufficient evidence (*i.e.* not a preponderance of a particular act or omission by Dr. Lebed that constituted

a breach of the aforesaid nonspecified standard; [and] (3) [t]here was no (or insufficient) evidence from which a jury could have found that a specific breach of a particular standard of care was, to a reasonable degree of medical certainty, the factual cause of the pain syndrome reported by Mrs. Asbury, whether it was RSD [reflex sympathetic dystrophy] or some other undiagnosed phenomenon." (Concise statement, motion for judgment n.o.v., paragraphs 1-3.)

Before discussion regarding the defendants' grounds for judgment n.o.v. commences, it is first necessary to note that, when they transferred this case which was initially filed under case caption number 05-4519 in the Court of Common Pleas of Philadelphia, PA, to be consolidated with the action against Dr. Kanoff in this court, the parties signed a stipulation before the transferring judge, and later approved by this court, that set forth provisions that stated: "(3) [t]here shall be no challenges to the legal sufficiency or admissibility of [p]laintiffs' proposed expert testimony, any or part thereof, based on *Frye; Daubert* or otherwise; any and all challenges shall go solely to the weight and not to the admissibility of the expert testimony"; and "(4) defendants will not challenge the legal or factual sufficiency of plaintiffs' case; in all instances, without exception, the issues of liability, causation and damages will be submitted to the jury for final determination." (See docketed with the trial record the stipulation and order to transfer Philadelphia action to Delaware County for joint trial, signed by Hon. Jacqueline Allen, dated May 8, 2008 and a complementary order signed and docketed on May 22, 2008 by this court.) Hence, it would appear that the de-

fendants waived most of the grounds asserted in this appeal before the record in this case ever came through the door of the Delaware County courthouse. Such a circumstance will be duly noted where appropriate in the ensuing analysis.

The defendants argued that they should be granted judgment n.o.v. because the inference of negligence could not arise from an ending of the Norplant removal with an "unfortunate result which might have occurred even though proper care and skill had been exercised." (Defendants' brief in support of post-trial relief, p. 19.) Defendants asserted that the plaintiff's Norplant removal expert, Dr. Papperman, never said that Dr. Lebed's technique of using a scalpel to make the incision and a hemostat to remove the Norplant rods was faulty, nor whether the use of either instrument had been faulty, nor which of the two defendant doctors had performed the negligent act, nor had Dr. Papperman defined the negligent act itself. (*Id.,* 19-20.) In the defendants' version of the events of February 20, 2003, Dr. Papperman's opinion, proffered within the requisite degree of certainty, that the plaintiff's "arm pain" had resulted from negligent performance of the operative procedure, taken in combination with the court's res ipsa loquitur instruction, led the jury improperly to infer negligence and to find liability only from her RSD brought about by an unproved "direct injury" to the plaintiff's median nerve. (*Id.,* 20.) Here again, as in their effort to confuse plaintiff's "arm pain" with the actual complained of injury to the plaintiff's median nerve as the cause thereof, the defendants seek to conflate the "unfortunate result" of arm pain with the nerve injury itself.

In any event, and although the defendants had stipulated away their ability to challenge its admissibility, the plaintiffs' expert testimony was legally sufficient to establish the defendants' breach of the applicable standard of care for Norplant removal. *Van Zandt v. Holy Redeemer Hospital,* 806 A.2d 879, 885-86 (Pa. Super. 2002), *appeal denied,* 573 Pa. 686, 823 A.2d 145 (2003) (table) (the court reviewing a decision to grant or deny a motion for judgment n.o.v. must decide whether there is sufficient competent evidence to sustain the verdict, reserving questions concerning the credibility and weight of the evidence to the finder of fact). The plaintiffs presented the expert testimony of Gerald E. Dworkin D.O., a physiatrist or pain specialist, who said he had seen Mrs. Asbury at the request of Dr. Lee on December 23, 2003, or 10 months after the Norplant removal procedure. (7/31/08 N.T. volume I 29.) Dr. Dworkin said that Dr. Lee had referred the plaintiff for an evaluation of why she was experiencing pain in her left arm and that he had diagnosed and subsequently treated her with nerve blocks and pain medication for a median nerve injury of that extremity that had occurred during the Norplant removal procedure. (*Id.,* 31-34, 46-52, 70.) Dr. Dworkin replied that negative results shown on prior objective test studies of plaintiff's median nerve did not surprise him[6] because:

6. There is other such testimony of record that the absence of objective test results used in diagnosing RSD were not dispositive of the question as to whether or not plaintiff was suffering from the disease. Dr. Daniel Gzesh, a neurologist who examined the plaintiff at Mercy Fitzgerald Mercy Hospital before and following neck surgery performed by Dr. Kanoff, testified that he found no objective evidence to support the plaintiff's claim of suffering from RSD, "but that doesn't mean she doesn't have it." (8/1/08 volume II 187, 209-16.)

"The EMG, again, to reiterate, is only positive when there is weakness or gross sensory loss. Those big fibers being involved. When there's pain, and burning and dysesthesia, so to speak, and uncomfortable sensations, that will escape detection on an EMG nerve conduction most of the time. So I was not surprised. I did the test myself . . . I found it normal." (*Id.,* 36.)

In March of 2004, after plaintiff presented to him with lower extremity and back pain symptoms, Dr. Dworkin determined that she was suffering from a Type II complex regional pain disorder, meaning that he assumed she had incurred a direct injury to her median nerve during the Norplant removal procedure. (*Id.,* 76-77.) The witness related that all of his clinical exams of the plaintiff were consistent with median nerve injury. (*Id.,* 77-78.) Dr. Dworkin stated that this diagnosis of the plaintiff remained the same during the entire time during which she treated with him for her CRPD. (Id., 92-93, 95.)

The defendants' EMG expert, Dr. David Feinberg, who had never performed such a procedure himself, nor examined the plaintiff, nor done an EMG study of her left upper arm, dogmatically insisted that the absence of indication on one EMG taken of her arm by another practitioner was proof positive that there had been no injury to her median nerve. (8/5/08 N.T. volume I 12, 101.) Dr. Feinberg, nevertheless, opined that "RSD can develop from other things like minor trauma [at the situs of the Norplant removal procedure] and what I'm also saying is the occurrence of that doesn't mean anything went wrong [because it was] a rare complication of surgery." (*Id.,* 59-60.) Dr. Feinberg went on to say that "any

type of trauma, even minor trauma" including soft tissue injury can cause Type I RSD which does occur after mild trauma pretty frequently. (*Id.,* 64-65.) It is apparent from the following line of questioning that Dr. Feinberg was unaware that not one case of RSD besides that of the plaintiff resulted from the Norplant removal procedure or he might have been less certain that her RSD could not have resulted from Dr. Lebed's negligence:

"Plaintiffs' Counsel: So the point is in this case all you are telling the jury is, look there's no way this lady suffered a nerve injury, a median nerve injury in my opinion, but the possibility does exist that she may have RSD as a result of tissue trauma? . . .

"Dr. Feinberg: I didn't say anything to you about tissue trauma. I said that surgery in and of itself is something that can trigger RSD.

"Plaintiffs' Counsel: Well, what about tissue trauma? What about if you got something pulling, yanking, twisting for an extended period of time just on the tissue? Let's forget about the nerve for a moment. That alone can cause RSD, can't it?

"Dr. Feinberg: Just cutting the skin with the scalpel can cause RSD.

"Plaintiffs' Counsel: I understand that, sir. But pulling on the skin, twisting of objects that are in the skin, embedded in the skin, those kinds of events can easily cause it if a simple—if the slicing by itself or a minor trauma can cause it, surely you would agree that major or excessive tissue trauma can certainly produce RSD, would it not?

"Dr. Feinberg: Any kind of trauma could cause RSD. There's not an increase[d] risk of RSD with twisting and pulling and stretching compared to just cutting the skin. RSD can happen after either one as I mentioned before . . . most of the patients I see have very minor trauma and probably that group of 10 percent that you quote from the one resource are people that have trauma so minor that they can't even remember what it was." (*Id.*, 65-67.)

The plaintiffs' Norplant removal expert, Dr. Thomas W. Papperman, testified that it was his opinion that the plaintiff was a victim of "surgical misadventure", or that "something went wrong" at Planned Parenthood when she had her Norplant rods removed on February 20, 2003. (8/5/08 N.T. volume II 194.) Cited to Dr. Lebed's testimony that he had made injections of anesthetic into the fatty or subcutaneous tissue below the rods in response to plaintiff's complaints of significant pain, Dr. Papperman replied that the literature providing instruction on the removal procedure clearly directs that anesthetic should be injected only as deep as the skin layer and that, where the patient is in significant pain, the correct action is to immediately stop and bring the patient back at another time for completion of the procedure. (*Id.*, 202-203, 221.) Dr. Papperman also related that significant pain being felt during the procedure is not normal, and that not stopping the procedure until the incision was healed in four to six weeks was unsafe. (*Id.*, 203.) According to the witness, the dangers of keeping going when the patient complained of significant pain included scar tissue formation that can entrap nerves and cause nerve injury. (*Id.*, 204-205.)

Dr. Papperman also spoke of the dangers of excessive tissue trauma at the situs of the procedure:

"Whenever you manipulate tissue, you inject it, you clamp it, you push it around, et cetera, you create a little bit of injury. The body responds by a little bit of swelling, which is where some fluid gets into the area around the individual cells. And you can cause little microscopic bleeding, et cetera, just in the course of normal operation this happens. When it becomes excessive is the point where it's damaging or doing something to anything but the area right where you're working . . . [then that's excessive tissue trauma—especially nerve injury?] yes." (*Id.*, 205-206.)

Dr. Papperman said that the median nerve would have been two centimeters, or less than an inch, below the Norplant capsules in the plaintiff's arm and that depressing the tissue above it would bring the nerve into even closer proximity—perhaps to within half an inch from the surface of the skin. (*Id.*, 206-208.)

Dr. Papperman then gave his opinion that an injury to the median nerve during Norplant removal surgery is a complication that normally does not occur in the absence of negligence and, that in doing his research for this testimony, he had been unable to find a case report of damage to the median nerve in a Norplant removal procedure. (*Id.*, 208, 210.) The witness testified that he had found a couple of reports of cases involving a more superficial branch of the median nerve being injured, but never the main branch of the median nerve, making the plaintiff's injury appear even more rare and evincing a substantial departure from the normal manner of doing the procedure or a "surgical misadventure" in performing

it. (*Id.*, 210-11, 213.) Dr. Papperman concluded his expert testimony by stating that it was uncertain whether the plaintiff's injury was the result of direct trauma to the median nerve or excess manipulation of the surrounding tissues to cause swelling that created some compression scarring which may have affected the nerve. (*Id.*, 213-14.)

The witness explained how a nerve injury could be sustained by dint of excessive manipulation of the surrounding tissues in the following manner: "Excessive palpation or pushing on the area, inadvertent injection of two much local anesthetic into the area would be the two things which would immediately come to mind." (*Id.*, 215-16.) Dr. Papperman said that in his opinion within a reasonable degree of medical certainty, Dr. Lebed had been negligent in persisting for a period of time, perhaps 15-20 minutes when the patient was in significant pain, because this should be a relatively painless procedure and in failing to stop it and sending the plaintiff home. (*Id.*, 216.) Dr. Papperman said that there could be a normal EMG despite a nerve injury because an EMG measures whether or not there is normal conductance of the motor and the sensory fibers in the larger nerve structure, whereas nerve and pain fibers that are smaller would not show a normal motor pain function. (*Id.* 263-64.) Because they had opened the door to questioning of Dr. Papperman about this subject matter themselves, defendants' objection to this testimony on redirect examination by plaintiffs' counsel was overruled when the witness advised the court that he was qualified to provide an answer the question since he had learned it in medical school. (*Id.* 261-64.)

The defendants argued that the evidence from both themselves and the plaintiffs established that RSD can be triggered by a slight trauma, such as an incision for Norplant removal, and that RSD is a "unique, unpredictable reaction of the human body with negligence having nothing to do with the harm, as it cannot be avoided by the exercise of due care." (*Id.*, 18.) However, here again, the defendants ignored their own acknowledgment that the RSD suffered by the plaintiff as a result of alleged damage to her median nerve is extremely rare, and that her RSD was the only such known case resulting from a Norplant removal procedure. (*Id.*, 6.) The defendants believed and averred that the plaintiffs' theory of their case hinged solely on a claim of a direct injury to the median nerve; that the defendants' expert testimony that Mrs. Asbury may have suffered a direct injury to her median nerve was utterly to the contrary; and that the absence of proof of a direct nerve injury by means of a positive EMG study of plaintiffs left upper arm conclusively adduced that the defendants were not negligent. (*Id.*, 18.) Nevertheless, the record clearly evinces that plaintiffs presented expert testimony to establish that it was not a cause for concern that the damage to plaintiffs' median nerve might not show up on an EMG study.

Indeed, the defendants' own EMG expert, Dr. David Feinberg, stated that excess, or even minor tissue manipulation that presumably might not show up on such a study could cause RSD. (8/5/08 N.T. volume I 65-67.) Dr. Daniel Gzesh, the neurologist who examined the plaintiff as part of Dr. Kanoff's treatment team, said that the absence of objective evidence to support plaintiff's claim of suffering from RSD, did not mean that plaintiff

did not have RSD. (8/1/08 N.T. volume II 187, 209-16.) Further, Dr. Papperman did not suggest or claim that the plaintiff had sustained either a direct (Type II) or indirect (Type I) assault on the median nerve over another, and, indeed, opined that either a direct hit or manipulation of the surrounding tissues could have been the cause of the injury that resulted in the plaintiff's RSD. Again, this is a conclusion with which Dr. Feinberg, the defendants' own EMG expert, agreed.

Plaintiffs presented the testimony of Mrs. Asbury's family physician, Dr. Reginald Lee, that plaintiff had first presented to him with left arm pain on February 25, 2003. (7/31/08 volume II 219.) Dr. Lee testified that, by March 4, 2003, the pain in plaintiff's left arm had spread into her left leg and by April 22, 2003, she had continued complaints of "left, upper arm pain, especially in her left hand, left elbow, left axillary area, the left thigh, and then of her left foot." (*Id.,* 220-23.) Dr. Lee said that, during a visit on April 22, 2003, he felt that plaintiff had developed RSD after sustaining a nerve injury during the Norplant removal procedure, but could not say exactly what kind of injury had been incurred. (7/31/08 N.T. volume II 223-26, 253-55.) Dr. Lee said, generally, "You've got a trauma to the nerve [by] . . . [h]itting it, or any kind of maneuvers to the nerve," and that, from the history that she gave him, Dr. Lee said he concluded that the plaintiff's nerve injury had been sustained in the Norplant removal procedure. (*Id.,* 225-26.) Dr. Lee related that he referred the plaintiff to a neurologist who administered an EMG to her left upper extremity which was normal. (*Id.,* 229, 316.)

Dr. Papperman, testified that it was unclear to him whether an injury to Mrs. Asbury's median nerve had been the result of direct trauma to the nerve itself, or due to excess manipulation of the surrounding tissues. (8/5/08 N.T. vol. I, 213.) Dr. Papperman stated that it was not necessary for a scalpel or a needle to be plunged into the nerve itself to cause the damage of which the plaintiffs complained. (*Id.*, 215.) Dr. Papperman also stressed that excess palpation or manipulation of the affected area and inadvertent injection of too much local anesthetic could have caused injury to the nerve as well. (*Id.*, 215-16.) Moreover, Dr. Lebed himself testified that it was possible to damage surrounding tissue and the median nerve by digging around in the area of the rods when attempting their removal. (8/4/08 N.T. volume II, 328-29.)

The defendants' contention that plaintiffs' sole theory of the case was a direct injury to plaintiff's median nerve, presumably inflicted by a scalpel or other medical instrument, is not accurate. Plaintiffs' counsel referred to reports of a general "nerve injury" resulting from Norplant removal during his opening statement to the jury and went on to describe RSD as resulting from "injury to the tissues or nerves or both" and from an "injury to the tissues of [plaintiff's] arm and to the median nerve of her left arm that runs directly below those tissues." (7/29/08 N.T. 50-51, 56-57.) Counsel for the defendants mentioned in his opening remarks that the jury might find that: "[i]f there is no direct hit on the nerve then you might be satisfied that there's RSD I because there was a trauma. That is a surgical insertion or some tissue manipulation." (*Id.*, 85.) During a side-bar conference several days after the beginning of the trial, plaintiffs'

counsel told the court that "[t]he claim is that the median nerve was either struck or the tissues surrounding it were excessively traumatized so it was a secondary damage, causing secondary damage to the median nerve . . . There's no way anyone can know exactly how it was injured. All we know is it was injured." (8/4/08 N.T. vol. I, 105-106.)

There was thus no mystery that, from the very beginning of this trial, the plaintiffs intended to prove that Mrs. Asbury's RSD was caused by median nerve damage incurred either directly or indirectly at the operative procedure situs. However, in his opening remarks to the jury, counsel for the defendants insisted that the plaintiffs' proof requirement was to show that Mrs. Asbury's pain was more likely than not caused by "a direct hit on the median nerve." (7/29/08 N.T. 88.)

With respect to plaintiffs' proving a breach of the standard of care, it was the defendants' theory that Dr. Lebed met the standard of care by stopping the procedure when he discovered that he could not remove the Norplant rods and summoning Dr. Wilson to continue performing the procedure. (7/29/08 N.T. 72.) Dr. Papperman testified that, in his opinion delivered within a reasonable degree of medical certainty, Dr. Lebed's attempted removal of the Norplant rods from plaintiff's left arm fell below the requisite standard of care because he persisted in futilely carrying on the procedure for 15 to 20 minutes, all the while knowing that the plaintiff was experiencing significant pain from a usually painless operation, and had not stopped it altogether and brought her back in four or more weeks. (*Id.,* 216-17.)

The defendant, Dr. Lebed, testified that his training in performing the procedure had been minimal; that he received no formal training from Wyeth, having taken instruction from a sales representative using an arm model and a booklet that described how to perform it; and that he had not viewed the Wyeth training video as part of his instruction. (8/4/08 N.T. volume I 124-28, 162-63.) Dr. Lebed said he had done only five or six Norplant insertions throughout the 1990s, during which period of time, he had done only two removals and only two others after that with the plaintiff's being the second. (*Id.,* 129-32, 202.)

Dr. Lebed said that it took him some 20 to 25 minutes to position the plaintiff on the table and to position the table itself so that he had a correct view of her arm with enough light, and that it never occurred to him to ask Dr. Wilson for assistance with that problem. (*Id.,* 148-54.) The defendant said that, instead of making the four millimeter incision recommended by Wyeth to begin the removal procedure, he had made a 20-25 millimeter, or approximate three-quarters of an inch, incision in her left upper arm because he felt it would make it easier for getting the rods out. (*Id.,* 168-69.) Dr. Lebed said it was only after the anesthetic injections into the fat layer under plaintiff's skin did not relieve her pain and he couldn't remove any of the rods, that he determined to seek Dr. Wilson's help. (*Id.,* 173-75.)

Dr. Wilson testified that she had performed hundreds of Norplant removals and considered herself to be proficient in their performance. (8/4/08 volume II 309.) The witness stated that the insertion of the rods in an upside

down position, like the plaintiff's, made it more difficult to position herself to obtain a correct angle for beginning the procedure, and that she had performed only 10 or so of this kind of Norplant removal in her career. (*Id.,* 301-302.) Dr. Wilson testified, upon questioning whether she was aware of Dr. Lebed's inexperience and lack of training to perform the procedure, that: "if he had never done them before and had no idea how to do them and went in to do that I would be appalled." (*Id.,* 310-12.) She also said he watched her use a "flip" maneuver to retrieve the first two rods and said she interpreted his remark, "so you know that maneuver?" as indicating he was unaware of it, or didn't use it himself. (*Id.* 313-14.) Having had her memory refreshed by statements made in her deposition, Dr. Wilson indicated that "digging around" at the situs of the procedure could result in "a big hematoma in the muscle with damage to the nerve," followed by a statement that "if you want me to say median nerve, you might be right." (*Id.,* 328-29.)

Therefore, a review of all of the foregoing evidence adduces that an instruction on res ipsa loquitur was properly given to the jury permitting them to resolve the issue of whether direct or indirect damage to Mrs. Asbury's median nerve had been sustained more likely than not due to Dr. Lebed's negligence during the time in which he was attempting to remove the Norplant rods from her left upper arm.

## C. *Conclusion*

Defendants contended that there was (1) no specific standard of care asserted by expert testimony to be ap-

plicable to Dr. Lebed's manner of the use of surgical instruments in the Norplant removal process; (2) insufficient evidence to prove any particular act or omission that constituted a breach of that standard of care; and (3) insufficient evidence from which a jury could have found that a specific breach of a particular standard of care was the factual cause of plaintiff's RSD. However, as the foregoing discussion clearly demonstrates, plaintiffs submitted sufficient expert testimony to meet the requirement of establishing the defendant's breach of the standard of care for performing a Norplant removal procedure. Dr. Lee testified that plaintiff's health took a turn for the worse after her Norplant removal procedure that he felt was caused by a nerve injury that led her to develop RSD. Dr. Dworkin testified that plaintiff had suffered a median nerve injury during the procedure that caused her RSD. Dr Papperman testified that Dr. Lebed breached the requisite standard of care by not stopping the procedure and sending the plaintiff home when he realized she was experiencing significant pain from a procedure that should have been relatively painless. Dr. Papperman testified that median nerve injuries are extremely rare and thus do not happen in the absence of negligence and that plaintiff's injury was the result of surgical misadventure by one or both of the defendants.

Defendants acknowledge that plaintiff's RSD was the only such case arising from a Norplant removal procedure performed on 100,000 or so American women. Any claim at this juncture that Dr. Papperman spoke to a wrong standard of care or that his testimony in that regard did not reach the requisite quantum of proof long after

defendants came into possession of his expert report, and then failed to raise these issues long before Dr. Pepperman testified at the trial has been both stipulated away and waived. The plaintiffs' evidence was sufficient to show that the defendant owed a duty to prevent injury to the plaintiff while performing the Norplant removal procedure, that he breached that duty by failing to stop the procedure and send the plaintiff home when he realized she was experiencing significant pain from the moment it had begun; and that she had been injured thereby.

The plaintiffs met the requirements necessary under section 328D(1) of the Restatement (Second) of Torts to allow the jury to decide whether the plaintiff's injury was caused either directly or indirectly, and more likely than not, by the negligence of Dr. Lebed when he was performing the Norplant removal procedure while exclusively in control of the situs thereof. The plaintiffs thus warranted an instruction on res ipsa loquitur by meeting their burden of establishing a circumstantial case of medical negligence sufficient to go to the jury.

A judgment n.o.v may only be entered in a clear case when (1) the movant is entitled to judgment as a matter of law, or (2), where the evidence is such that no two reasonable minds could disagree that the outcome should have been rendered in the movant's favor. *Quinby v. Plumsteadville Family Practice Inc., supra* at 204, 907 A.2d at 1074. In the first instance, the court reviews the record and concludes that, even with all factual inferences decided adverse to the movant, the law nevertheless requires a verdict in his or her favor; whereas with the second, the court reviews the evidentiary record and

concludes that the evidence was such that a verdict for the movant is beyond peradventure. *Id.*

When reviewing a trial court's denial of a motion for judgment n.o.v., the appellate court must consider all of the evidence in the light most favorable to the verdict winner, giving that party the benefit of every reasonable inference arising therefrom. *Rohm and Haas Company v. Continental Casualty Company,* 566 Pa. 464, 781 A.2d 1172 (2001). Any doubts must be resolved in favor of the verdict winner, and appraisement of the evidence may not be based on how a judge would have voted as a member of a jury, but on the facts as they come through the sieve of a jury's deliberations. *Rohm and Haas Company v. Continental Casualty Company, supra.* The reviewing court must decide whether there is sufficient competent evidence to sustain the verdict, reserving questions concerning the credibility and weight of the evidence to the finder of fact. *Van Zandt v. Holy Redeemer Hospital, supra,* 806 A.2d at 885-86.

Reversal of the trial court's ruling on a motion of this nature will result where there is an abuse of discretion or an error of law that controlled the outcome of the case. *Timbrook v. Foremost Insurance Company,* 324 Pa. Super. 384, 471 A.2d 891 (1984). In examining such a determination, the appellate courts' scope of review is plenary, as it is with any review of questions of law. *Phillips v. A-Best Products Company,* 542 Pa. 124, 130, 665 A.2d 1167, 1170 (1995).

Based upon the foregoing analysis of the evidence of record and the cited case authorities, the denial of the defendants' motion for judgment n.o.v. was appropriate and should not be disturbed on appeal.

## II. MOTION FOR A NEW TRIAL

Defendants seek a new trial in light of the alleged prejudicial impact, individually and cumulatively, of the following rulings:

### A. *Special Jury Interrogatory*

The defendants contend that the court erroneously refused to adopt the proposed special jury interrogatory that would have required the jury to decide expressly if the left median nerve had been injured, "since the plaintiff had asserted a specific factual assertion [sic] as central to the jury's determination—that the Type II RSD condition was triggered by a specific act in breach of the standard of care which proximately caused damage to the left median nerve." (Concise statement, motion for new trial, paragraph 1.) It has been shown that this ground has been waived for failure to timely raise it of record before the jury returned with its verdict.

### B. and C. *Elimination of Other Responsible Causes for Injury*

The defendants allege that the court erroneously refused, at the end of the presentation of all the evidence, to rule as a matter of law that the doctrine of res ipsa loquitur was not applicable to the facts of this case, where plaintiffs' evidence had not met the specific mandatory foundation for the application of the doctrine—the elimination of "other responsible causes." (Concise statement, motion for new trial, paragraphs 2-3.)

The record is replete with expert testimony submitted by the plaintiff that her injury occurred when Dr. Lebed

was performing the Norplant removal procedure while fully in control of the operative site, and that there were no other responsible causes for her median nerve injury attributable to her or third persons. *Hightower-Warren v. Silk, supra; Leone v. Thomas, supra.* Moreover, the record is clear that the defendants did not timely raise any such objections before the jury returned with its verdict.

For all of the reasons discussed at length hereinabove regarding denial of the defendants' motion for judgment n.o.v., these contentions are wholly lacking in merit.

## D., E. and F. *Causation Evidence*

The defendants believe and aver that the court erroneously instructed the jury that the doctrine of res ipsa loquitur could apply in their deliberations, where plaintiffs' counsel, during closing argument, declared that plaintiffs' theory of liability had nothing to do with a direct injury to the median nerve, but instead that the elements of negligence had been proved, by reason of some sort of "excessive tissue manipulation." (Concise statement, motion for new trial, paragraphs 4-6.)

The defendants assert also in this light that the court erroneously allowed plaintiffs' experts to refer to "excessive tissue manipulation" as establishing or suggesting a standard of care. Defendants contend that the evidence clearly established that the concept could not have applicability as a standard of care capable of being met in an objective manner by a physician engaged in the removal of Norplant rods. Defendants allege that, in hav-

ing permitted the plaintiffs to offer this evidence about standard of care, the court erroneously permitted the jurors to confuse the assessment of proximate cause from that particular breach by inviting them to consider the doctrine of res ipsa loquitur, which in their view, has only to do with a legally-proper inference of negligence; it has nothing to do with consideration of the separate question of proximate cause.

The defendants additionally contend that the court, over objection, erroneously instructed the jury on the doctrine of res ipsa loquitur where plaintiffs undertook to prove both proximate cause and negligence by the evidence of onset of reflex sympathetic dystrophy (RSD) or some other pain syndrome. The record adduces no such objection to the court's charge on res ipsa loquitur before the jury rendered its verdict, and this ground must be deemed waived. Moreover, the record evinces no such causation or negligence theory being advanced by the plaintiffs, who never stopped asserting that the RSD was caused by Dr. Lebed's negligently having injured Mrs. Asbury's median nerve.

Here again, for reasons discussed at length herein-above, all of these contentions are clearly lacking in merit. First, the theory of excessive tissue manipulation was not submitted as evidence of a breach of the standard of care but as causation evidence of Mrs. Asbury's nerve injury. Moreover, even if it were submitted as expert testimony for the reason defendants suggest, the defendants had stipulated away their right to protest its admissibility when transferring this action from the Court of Common Pleas of Philadelphia County to the Court of Common Pleas of Delaware County. Second, the record

plainly evinces no abandonment by the plaintiffs of any theory of direct injury to Mrs. Asbury's median nerve at the hands of the defendants. Indeed, excessive tissue manipulation was theorized by Dr. Feinberg, the defendants' own expert, to be as damaging an instrumentality to the median nerve as any medical instrument that was used in the procedure. It was the jury's job to decide whether the damage to the plaintiff's median was sustained due to Dr. Lebed's negligence. Finally, this jury was allowed reasonably to infer that the occurrence of such an unusual event during a procedure performed under the guidance and exclusive control of Dr. Lebed established both negligence and causation. *Leone v. Thomas, supra.*

## G. *Standard of Care Evidence*

The defendants contend that the jury's finding of negligence on the part of Dr. Lebed was against the weight of the evidence where there was no testimony allegedy in conflict with Dr. Lebed's testimony in substance that his conduct was in accord with the recommendations of the manufacturer of the Norplant rods which, "in any event, did not establish a standard of care as contended by the plaintiffs regarding the technique to be used to remove Norplant rods." (Concise statement, motion for new trial, paragraph 12.) With all due respect to the defendants, it is not within their purview to establish their own standard of care in a medical malpractice action. There has never been a statement made of record that the plaintiffs believed that the Wyeth brochure established the standard of care. Defendants seem to believe that every bit of evidence presented by the plaintiffs was

intended to establish the standard of care and that simply is not true.

The defendants continually ignore in this context that the standard of care said to have been breached by Dr. Lebed was that he did not stop the procedure when confronted by plaintiff's repeated complaints of significant pain and did not send her home to return in four to six weeks. Further, defendants defend Dr. Lebed's failure to do so as of no moment on the part of a board certified gynecological surgeon with 27 years experience. (Defendants' reply to plaintiffs' brief on post-trial motions, 2, 4.) Unfortunately for the defendants, Dr. Lebed was charged with breaching the standard of care in conducting a surgical procedure on the plaintiff's arm, a distinction the jury did not miss in finding him negligent and that his negligence had caused injury to the plaintiff's median nerve.

That being said, the record adduces that Dr. Lebed never watched Wyeth's training tape for the procedure, and that he received his instruction in performing it from a sales rep using a booklet and arm model as teaching aids. The jury heard that Dr. Lebed took 20 to 25 minutes to position plaintiff on the table and himself over the operative *situs* before even starting the procedure; that afterward in response to her complaints of significant pain, he injected her too frequently with too much anesthetic; and that he had made an incision much wider than the four millimeters recommended in the Wyeth brochure. Therefore, it could hardly be a serious suggestion that Dr. Lebed, who had performed only a few Norplant extraction procedures over the course of a decade fol-

lowing rudimentary training could ever be deemed qualified to establish the standard of care applicable to the Norplant removal procedure himself.

Be that as it may, the plaintiffs presented testimony from Dr. Papperman, whose long experience with Norplant insertion and removal qualified him as an expert to define the requisite standard of care therefor, that the defendant had breached it by continuing to inject the site of the Norplant removal with anesthetic, and by not discontinuing the procedure upon the plaintiff's continuing complaints of significant pain and immediately sending her home. Further, the defendants had stipulated away their ability to dispute the admissibility of the plaintiffs' expert testimony submitted to establish the standard of care. That the jury decided plaintiffs' evidence was more weighty, credible and reliable than the inexperienced Dr. Lebed's testimony now purportedly proffered to establish his own standard of care renders this appellate assertion itself incredible. Moreover, it goes without saying that defendants' repeated claims that no standard of care for Norplant removal was ever established by the plaintiffs are not in accord with the evidentiary record. (Defendants' reply to plaintiffs' brief on post-trial motions, 4.)

## H., I. and J. *Dr. Papperman's Expert Testimony*

The defendants contended that the court erroneously permitted plaintiffs' Norplant removal expert, Dr. Papperman, (1) to give testimony on opinions beyond the boundaries of his written report; (2) to give testimony that was speculative and purportedly contradicted by

allegedly uncontested medical facts; and (3) to give opinion testimony on matters strictly within the medical specialty of neurology that he was purportedly not qualified to provide. (Concise statement, motion for new trial, paragraphs 7-9.) Here again, the defendants stipulated away their ability to contest the admissibility of plaintiffs' expert witness testimony and these grounds must be deemed waived.

Furthermore, the foregoing grounds for post-verdict relief were submitted without the requisite citation to the place where the alleged errors appear in the voluminous trial record. (Defendants' brief in support of motion for post-trial relief, 16-17.) Therefore, all of these contentions are additionally waived for being presented as mere boilerplate without appropriate legal argument in support thereof and without citation to the places in the record where the purported errors of the court took place. Pa.R.C.P., 227.1(b)(2) and explanatory comment 1983; *Frank v. Peckich,* 257 Pa. Super. 561, 579, 391 A.2d 624, 632-33 (1978).

More troubling for the court, however, is that the defendants are now protesting the admissibility of testimony they either elicited or to which they opened the door themselves. Moreover, when Dr. Papperman testified on direct examination regarding the possibility of indirect injury to the median nerve by means of "excessive tissue manipulation" as theorized in the first of his expert reports, there was no objection from the defendants. (8/1/08 N.T. volume I 149-53, 254.) Thereafter, the defendants' cross-examination of Dr. Papperman regarding this testimony involved the following line of questioning:

"Defense Counsel: . . . Excess tissue trauma, is that a medical word of art? Will I find that in a medical dictionary? . . . Excess is the result of the tissue trauma that's there, isn't that right? That you see the tissue trauma and then you say that's excess tissue trauma. Have I used it correctly? . . . Is there anything that says watch out for excess tissue trauma and here's what it is? . . .

"Dr. Papperman: You limit the number and amount of anesthetic which is injected. You carefully make an incision that is just enough to get through the skin. When you put your curve hemostat through that incision you immediately turn it up and you try to [inaudible] the skin to s[t]ay away from surrounding structures. When you go to open [the clamp] you open it slowly as opposed to snapping it open . . . [to] give the tissue . . . a chance to move it, but as opposed to snapping it open . . . It's almost the difference just as a little bit of clarification as to the difference if I have Saran Wrap stretched over the top of this and I push my finger into it slowly, the Saran Wrap gives way. The one is gentle. The other is excessive.

"Defense Counsel: So how much—you told us the whole thing that you should do to avoid excessive tissue trauma." (8/5/08 N.T. volume II 239-42.)

Later cross-examination testimony elicited by the defendants from Dr. Papperman was that tissue trauma can cause RSD Type I. (*Id.,* 255.) It is unclear why defendants would raise this issue at all, inasmuch as their own expert, Dr. Feinberg, testified that RSD Type I can be caused by excessive tissue manipulation at the situs of a surgical procedure. (8/5/08 N.T. volume I 64-67.)

Defendants also take issue with testimony they themselves elicited from Dr. Papperman regarding the lack

of positive objective imaging scans adducing median nerve damage at the situs of the procedure. (*Id.,* 255-60.) However, when plaintiffs sought redirect testimony from Dr. Papperman as to whether a negative EMG made a difference in diagnosing RSD, and even though he had solicited the same testimony from Dr. Papperman himself, defendants' counsel objected on grounds that Dr. Papperman was not qualified to answer the question. (*Id.,* 260-63.) The objection was overruled after the witness said he had learned the answer in medical school and felt qualified to testify on the subject. (*Id.,* 263-64.) It is axiomatic in the law of this Commonwealth that parties may not object to testimony on appeal that they had elicited themselves at the trial. *LaFuria v. New Jersey Insurance Co. of Newark,* 131 Pa. Super. 413, 200 A. 167 (1938).

Defendants' counsel raised the objection of being outside of the scope of his expert report any questioning of Dr. Papperman regarding the MRI of October 17, 2005, which unlike one said to have been taken in December of 2004, did show subcutaneous thickening or scar tissue in Dr. Papperman's opinion. (*Id.,* 265-72.) That objection was overruled, without further objection or exception thereto, following advice from the court that the weight of this testimony could be challenged on re-cross-examination. (*Id.,* 266.) Here again, it is noted that the defendants had previously stipulated away their ability to question the admissibility of plaintiffs' expert testimony on grounds of "*Frye, Daubert* or otherwise."

A court reviewing a trial court's ruling on the admission or exclusion of evidence, including the testimony of an expert witness, utilizes a well-established and very

narrow standard. The job is not to assess independently the proffered testimony, but to decide whether or not the decision to admit or exclude such evidence lay within the sound discretion of the trial court, and to reverse only upon a showing of abuse of discretion or error of law. *Winschel v. Jain,* 925 A.2d 782 (Pa. Super. 2007), *appeal denied,* 596 Pa. 709, 940 A.2d 366 (2008) (table); *Smith v. Paoli Memorial Hospital,* 885 A.2d 1012, 1016 (Pa. Super. 2005). "An abuse of discretion may not be found merely because an appellate court might not have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill will, or such lack of support so as to be clearly erroneous." *Grady v. Frito-Lay Inc.,* 576 Pa. 546, 559, 839 A.2d 1038, 1046 (2003). In addition, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *McClain v. Welker,* 761 A.2d 155, 156 (Pa. Super. 2000).

"The test to be applied when qualifying a witness to testify as an expert witness is whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine." Pennsylvania Rule of Evidence 702, comment citing to *Miller v. Brass Rail Tavern Inc.,* 541 Pa. 474, 480-81, 664 A.2d 525, 528 (1995); see also, *Wexler v. Hecht,* 847 A.2d 95 (Pa. Super. 2004), *aff'd,* 593 Pa. 118, 928 A.2d 973 (2007)(podiatrist unqualified to establish standard of care applicable to orthopedic surgeons). Although defendants have not cited to any legal authority in support of their contentions

that Dr. Papperman was unqualified to remark upon the meaning of a normal or unremarkable EMG study vis-à-vis a diagnosis of RSD, the court notes that, in medical malpractice actions, the standard for qualification of an expert witness is set forth in section 1303.512 of the Medical Care Availability and Reduction of Error (MCARE) Act, 40 P.S. §§1303.101-1303.910. Section 1303.512 of the Act, governing expert qualifications, provides:

"(a) General Rule.—No person shall be competent to offer an expert medical opinion in a medical professional liability action against a physician unless that person possesses sufficient education, training, knowledge and experience to provide credible, competent testimony and fulfills the additional qualifications set forth in this section as applicable.

"(b) Medical Testimony.—An expert testifying on a medical matter, including the standard of care, risks and alternatives, causation and the nature and extent of the injury, must meet the following qualifications:

"(1) Possess an unrestricted physician's license to practice medicine in any state or the District of Columbia.

"(2) Be engaged in or retired within the previous five years from active clinical practice or teaching.

"*Provided, however, the court may waive the requirements of this subject for an expert on a matter other than the standard of care if the court determines that the expert is otherwise competent to testify about medical or scientific issues by virtue of education, training or experience.*" 40 P.S. 1303.512. (emphasis added)

Since Dr. Papperman's testimony regarding interpretation of an EMG did not go to the standard of care in performing Norplant removal surgery, the court properly determined that he was qualified to give such testimony even had the defendants not voluntarily stipulated that they could not challenge the admissibility of plaintiffs' expert testimony on any grounds. 40 P.S. §1303.512; *Wexler v. Hecht, supra.*

For all of the foregoing reasons, there was neither an error of law, nor discretionary abuse in the making of any of the contested evidentiary rulings surrounding the testimony of plaintiffs' Norplant removal expert, Dr. Thomas W. Papperman.

### K. *Surgical Instruments, Practice Arm and Norplant Rods to Jury Room*

The defendants complain that the court erroneously refused their request to permit the jury to take the surgical instruments, simulated practice arm and Norplant rods with them into the jury room on grounds that both defendants' and plaintiffs' counsel offered testimony about them, and where the use of the instruments was allegedly central to the jury's deliberations on negligence and proximate cause. (Concise statement, motion for new trial, paragraph 10.) Because this contention is mere boilerplate and utterly lacks citation to the record in which any such request and its rejection may have appeared, as well as argument that included appropriate supporting legal authority being entirely omitted from the defendants' brief in support of their motion for post-trial relief, it is deemed waived. Pa.R.C.P. 227.1; *Frank v. Peckich, supra.*

## L. *Inconsistent Verdict*

The defendants allege that the jury finding that Dr. Lebed was negligent was logically and factually inconsistent with the jury finding that Dr. Janet Wilson was not negligent, and therefore, the verdict as to Dr. Lebed is flawed as a matter of law. (Concise statement, motion for new trial, paragraph 11.) Because this contention was submitted in mere boilerplate fashion in one short paragraph on pages 24 and 25 of the defendants' brief in support of their motion for post-trial relief without mention of, nor citation to, appropriate legal authority, it must be deemed waived.

In any event, there was sufficient evidence from which the jury could reasonably have concluded that Dr. Lebed and not Dr. Wilson was negligent. The jury could have considered that Dr. Lebed was Dr. Wilson's superior at the clinic, yet had no training in performing the procedure beyond a sales representative's instructions using a Wyeth booklet and arm model, and had performed only two Norplant extractions throughout the 1990s, with plaintiff's being only the second since then. There was also evidence from which the jury could reasonably infer that Dr. Lebed was unfamiliar with the "flip" technique used by Dr. Wilson to start the extrication of the first two rods. The jury heard that Dr. Lebed had made a five-times larger incision than the one recommended by Wyeth and had injected more anesthetic more frequently than is the usual practice and that he had injected it into the fatty layer under the skin. Finally, after 20 to 25 minutes spent positioning the plaintiff on the table and finding a position in which he could perform the procedure himself,

Dr. Lebed was unable to extract one rod during the next 15 or so minutes while the plaintiff was complaining of significant pain, gave up, and went to find Dr. Wilson to do the procedure for him when the standard of care required that he stop it and send the plaintiff home for four to six weeks.

For all of the foregoing reasons, this verdict was not inconsistent, and, in any event, this issue has been waived.

## Conclusion

The standard of review for the denial of a motion for a new trial is whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion. *Randt v. Abex Corporation,* 448 Pa. Super. 224, 231, 671 A.2d 228, 232 (1996). An abuse of discretion is not merely an error in judgment; rather it occurs when the law is overridden or misapplied, or when the judgment exercised is manifestly unreasonable, or is the result of partiality, prejudice, bias or ill will. *Majczyk v. Desch,* 789 A.2d 717, 720 (Pa. Super. 2001). A new trial will be granted on grounds that the verdict is against the weight of the evidence only where the verdict is so contrary to the evidence it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Petrasovits v. Kleiner,* 719 A.2d 799, 803 (Pa. Super. 1998); *Watson v. American Home Assurance Company,* 454 Pa. Super. 293, 302, 685 A.2d 194, 198 (1996), *appeal denied,* 549 Pa. 704, 700 A.2d 443 (1997). An appellant is not entitled to a new trial where the evidence

is conflicting and the finder of fact could have decided for either party. *Kruczkowska v. Winter,* 764 A.2d 627, 629 (Pa. Super. 2000). A court, in disposing of a motion for new trial, is not to consider evidence in the light most favorable to the verdict winner; rather, the court must view all of the evidence. *Peair v. Home Association of Enola Legion No. 751,* 287 Pa. Super. 400, 410, 430 A.2d 665, 670 (1981).

Viewing all of the evidence and the rulings complained of by the defendants, this verdict was not so contrary to the evidence that it shocks one's sense of justice and renders the award of a new trial imperative so that right may be given another opportunity to prevail. *Petrasovits v. Kleiner, supra; Watson v. American Home Assurance Company, supra.* The defendants' self-serving and occasionally misguided assumptions about the facts and the law employed in challenging the jury's verdict following consideration of all of the evidence, as well as the court's rulings made during a trial that resulted in a decision with which they do not agree, cannot change that conclusion, and it should not be reversed on appeal. *Peair v. Home Association of Enola Legion No. 751, supra; Kruczkowska v. Winter, supra.*

## III. MOTION TO MOLD OR MODIFY VERDICT RE: LOSS OF EARNING CAPACITY

According to the defendants, plaintiffs' actuarial accounting economics expert, Dr. Andrew C.I. Verzilli, did not reduce his $1,094,805 calculation of plaintiff's lifetime earning capacity to present value as required by section 510 of the MCARE Act. 40 P.S. §1303.510 ("[f]uture

damages for loss of earnings or earning capacity in a medical professional liability action shall be reduced to present value."). (Concise statement, motion to mold or modify verdict re: loss of earning capacity, paragraph 1.) This objection could have been made before or after the jury's verdict was delivered but not yet certified, but was never timely raised and must be deemed waived. *City of Philadelphia Police Department v. Gray,* 534 Pa. 467, 633 A.2d 1090 (1993); *Dilliplaine v. Lehigh Valley Trust Co., supra* (a ground for new trial or judgment n.o.v. must be raised timely in pretrial proceedings or during the trial, thus affording the court the opportunity to correct the error).

This ground too was submitted in mere boilerplate language in the form of a short list of reasons for its having been raised and incorporating the defendants' argument proffered in their motion to mold the verdict. Nevertheless, the defendants' contention that Dr. Verzilli had not discounted the future lost earnings of the plaintiff is utterly contradicted in the trial record of his testimony. Most crucial, however, is the fact that, during the September 28, 2009 hearing on the defendants' motion for post-trial relief, counsel for the defendants twice told the court that he did not contest the plaintiffs' post-verdict calculations in support of the plaintiffs' motion to mold the verdict except for plaintiffs' estimated total for delay damages. (9/28/09 N.T. 42, 46.) The following day, on September 29, 2009, the court issued its order denying the defendants' motion for post-trial relief and granted, on grounds that the defendants had never filed a timely response thereto, the plaintiffs' motion to mold verdict and to enter final judgment thereon reflecting the

jury's verdict for the past and future lost earnings of Mrs. Asbury.

Examination of the transcript of Dr. Verzilli's testimony adduces that he said he had based his computation of plaintiff's lost lifetime earnings capacity on a recommended yearly earning capacity of $31,450 submitted by Mr. Daniel Rapucci, plaintiffs' vocational rehabilitation and counseling expert. (8/7/08 N.T. volume I 45-46, 85-90.) The witness said he had then multiplied that figure by the number of years Mrs. Asbury would have worked as a secretary through a retirement age of 67 years to arrive at a high end total of $967,291 for future lost earnings which, when discounted to its present value, would amount to $719,878 if the economy were to grow at only 3.4 percent. (*Id.,* 85-90.) Having calculated the plaintiff's lost past earning capacity to amount to $131,122, the witness indicated that present value of plaintiff's past and future earning capacity would amount to $851,772. (*Id.,* 90-92.) The dollar amount claimed to have represented a nondiscounted figure of $1,094,805 in lost future earnings never appeared in the transcript of Dr. Verzilli's testimony which also adduces that he was never asked to provide such a figure! (*Id.,* 75-117 passim.)

What appears to have happened here is that defense counsel has assumed that the jury's award for lost future earnings was a direct reflection of Dr. Verzilli's recommended dollar figure therefor. However, the defendants never availed themselves of the ability to test this assumption for certain because they never raised a timely challenge to that figure before the verdict was certified.

292

For all of the foregoing reasons, this last ground raised in the defendants' appeal is deemed utterly lacking in foundation and this determination should not be disturbed on appeal.